*327 OPINION OF THE COURT
Alan Broomer, J.
Once life was simpler. Men lived and were governed by short catchy sayings: Possession is nine tenths of the law; all men are presumed to know the law; and its corollary — ignorance of the law is no excuse. Simple rules sufficed in a simpler time.
In an age that valued simplicity, strict adherence to principle made for a swift and uncomplicated system of criminal justice. Strict and unbending application of the law upon a largely uneducated populace, while justified in the interest of society, was often unnecessarily cruel and contributed its share of horror stories to legal literature.
Today, we are said to be more sophisticated, more caring. Our social order values the individual who has rights he can assert against the State, especially in situations where the very State that seeks to punish him misled him into a violation of law. That’s what this case is about.
STATEMENT
Indicted for multiple counts of handgun possession and a single count of possession of weapons with intent to sell, the defendant, Richard Studifin, waived a jury and the case was tried by the court. Decision was reserved pending submission of briefs. This is the decision and its reasoning.
THE FACTS
The case could have been tried on an agreed statement of facts; the only issue for the court to decide and upon which my decision turns is the defendant’s state of mind during the time he purchased and stored the handguns.
On April 15, 1985, pursuant to a search warrant,* officers of the New York City Police Department searched the defendant’s room in a YMCA and recovered 14 handguns and a quantity of ammunition. The defendant had been employed as a cab driver and hoped to open a sporting goods store; the *328 weapons had been purchased as stock for the yet to be opened store.
The police learned of his cache through his procurement of the necessary Federal licenses to make the initial wholesale purchases.
On March 25, 1985, a Federal inspector visited his room at the "Y” to conduct an administrative inspection of the premises listed on the defendant’s Federal firearm’s license; two citations resulted. Studifin contested the citations in the form of a "Notice of disagreement” wherein he argued that since he was not presently conducting a retail business in his YMCA room, he was not in violation of the particular regulations; he served the notice upon both the Federal agency and the police License Bureau. The visit of April 15 was the official response.
Before obtaining the handguns, Studifin obtained a Federal firearms license which permitted him to purchase his stock of weapons. Along with his Federal firearms license, he was sent various booklets prepared by the Bureau of Alcohol, Tobacco and Firearms (ATF). Three of the booklets contain 104 pages of materials; a fourth of 227 pages lists the State regulations in type less than one-sixteenth inch high. A letter from ATF informed him that he needed an additional local license if he intended to sell handguns in New York. The letter was signed by the regional regulatory administrator.
THE PEOPLE’S ARGUMENT
The People contend they have satisfied the requirements of Penal Law § 265.01 in proving defendant’s "knowing possession” of the contraband weapons. All the statute demands is a naked possession that the defendant is aware of; no specific criminal intent or general mens rea need be shown. Furthermore, the defendant’s claim of ignorance of local law is belied by his possession of the booklets containing local laws which state the necessity of a New York license to possess as well as to sell firearms.
THE DEFENDANT’S RESPONSE
In the main, the defendant relies upon Penal Law § 15.20 (2): "A person is not relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief that it does not, as a matter of law, constitute an offense, unless such mistaken belief is founded upon an official statement of the law contained in * * * (d) an interpretation of the *329 statute or law relating to the offense, officially made or issued by a public servant, agency or body legally charged or empowered with the responsibility or privilege of administering, enforcing or interpreting such statute or law.”
He argues that he thought he was in complete compliance with the law since all he did was lay in a stock of handguns, store them in their original containers and obtain the necessary applications for local licenses which he intended to obtain at such time in the future when he was ready to open a store and conduct his sporting goods business.
THE LAW
Ignorance of the law is no excuse is a solidly embedded principle of the common law. It follows from the axiom "all men are presumed to know the law”. Since knowledge of the law is presumed conclusively, it is not possible for any man to be ignorant, hence the unavailability of an excuse founded upon an impossibility.
There was little need to test the accuracy of the proposition until relatively modern times since most of the earlier crimes were malum in se and as such well integrated with the mores of the time, e.g., it was sinful as well as criminal to murder, to steal and to burn down one’s neighbor’s house. The evil attendant to those acts was self-evident since all men objected to being murdered, as well as to having their property stolen and their houses destroyed by fire. (See generally, Holmes, The Common Law, at 125 [1881].)
The emergence of the modern ideological super State with independent needs and rights and an agenda for enforcing them has wrought significant changes in this area of the law. Whereas at common law there was no crime unless an evil act was coupled with an evil intent, now an act or a failure to act as long as done "knowingly” or "voluntarily”, could be criminal even where neither the conduct nor its accompanying mental state was "evil”. Under such conditions Blackstone’s characterization of the principle as "an absolute presumption of knowledge of the law” is indefensible. It has been said that "on many points no one can know the law and no one does know the law on all points.” (See generally, Ryan v State, 104 Ga 78, 82, 30 SE 678, 680 [1898].)
More recently, the principle’s retention has been, urged on pragmatic grounds. It is almost impossible for courts to determine a defendant’s actual ignorance of the law and further *330 whether the ignorance was inevitable or was the defendant’s fault. (See, 1 Austin, Jurisprudence, at 498-500 [3d ed 1869]; People v O’Brien, 96 Cal 171, 31 P 45.) Justice Holmes’ view was that placing the burden upon the defendant of proving ignorance would solve the jurisprudential problem. (Holmes, op. cit., at 48.) Unfortunately, New York has not implemented Justice Holmes’ position in this regard.
Whether accepted axiomatically or justified on pragmatic grounds the principle remains. Denial of the defense (also known as mistake of law) and resultant convictions are justified as needed to educate the public as to the law’s existence and to aid in establishing the conduct prescribed as new social mores. (See, Williams, Criminal Law, The General Part, at 289 [2d ed 1961].)
While conducing to a more efficient jurisprudence and indeed educating the general public, the unbending and unreflective rejection of the mistake of law defense has produced cases whose results to the modern reader seem unduly harsh and unfair. The sense of unfairness is heightened where the mistake of law was caused by a public official advising that a particular action was authorized or not criminal. Thereafter for the State to prosecute someone for innocently acting upon such mistaken advice is akin to throwing water on a man and arresting him because he’s wet. Hoover v Alabama (59 Ala 57, 60) is illustrative. There the defendant contracted a mixed-race marriage after being informed by a probate Judge who issued him a marriage license that it was lawful for him to marry a woman of another race. Thereafter he was convicted for violating the State miscegenation laws; testimony concerning the probate Judge’s advice was excluded as irrelevant.
Our own State contribution from this benighted period is reported in People v Weed (29 Hun 628, affd 96 NY 625). That case involved a bigamy prosecution. Weed sought to defend by showing that he and his first wife had signed articles under seal in Connecticut, that if either party should apply for a divorce the other would not oppose the application and would not appear against the petitioning party. Proof was offered that the Justice of the Peace who witnessed the paper advised Weed that in effect it was a legal divorce. The trial court excluded both items of proof and was sustained on appeal; the appellate court reaffirming the general rule: "[A]ll are presumed to know the law, and that ignorance of the law excuses no one from crime * * * Neither the deputy sheriff who drew the paper nor the justice who read it over could destroy the *331 effect of an intentional violation of a statute, by advice that such violation could be lawfully done.” (29 Hun, at p 629.)
With "the increasing complexity of law, the multiplication of crimes mala prohibita, and a more exact definition of fundamental principles of criminal liability” certain exceptions to the general rule have emerged (Hall and Seligman, Mistake of Law and Mens Rea, 8 U Chi L Rev 641, 642). This is particularly so where "the vast network of regulatory offenses which make up a large part of today’s criminal law does not stem from the mores of the community” (LaFave and Scott, Criminal Law, at 364 [1972]). Thus, where it is "[undesirable to characterize as criminal an individual who has not demonstrated any degree of social dangerousness” (ibid.), the modern trend has been to recognize mistake of law as a defense in limited instances. In that way, fair results may be obtained without undue risk of spurious litigation.
The doctrine of executive estoppel has emerged to mitigate the harsh results of a complete rejection of law defense. It finds expression in Penal Law § 15.20 (2), and plainly encompasses legislative and judicial as well as executive pronouncements as bases of mistaken beliefs.
The doctrine of executive estoppel has been asserted, as here, as a defense to charges of acting without first obtaining a necessary license. Results have been mixed, at least in California. In People v Ferguson (134 Cal App 41, 24 P2d 965 [1933]), an appellate court reversed a conviction because the trial court had improperly excluded proof that a public official had advised the defendant that he need not obtain a license before issuing a particular security. However, Ferguson was not followed in a later appellate decision because the official giving the misleading advice was not directly in charge of administering State law and issuing licenses under it. The court rejected the defense that the defendant had obtained a license under city law and acted after being advised by the local police commission that his conduct was lawful. (People v Settles, 29 Cal App 2d 781, 78 P2d 274 [1938].)
Settles’ reasoning (supra) has been criticized. The action of any official who is appointed to represent the State in its dealings with the public in some particular matter should bind the State affording a defense to a criminal prosecution when the defendant proves that he acted in reasonable reliance on the official’s advice to his detriment. Obviously, where the advice comes from a public official whose position is *332 unrelated to the area in which he presumes to advise, the defense should not lie. (See, Penal Law § 15.20 [2]; and generally, Hall and Seligman, op. cit., at 682-683; State v Simmons, 143 NC 613, 56 SE 701 [1907].)
It is clear that by enacting section 15.20 (2) the Legislature sought to provide a defense to the law-abiding citizen, who had done everything which may reasonably be expected of him, but had been misled by an official whose duties included official interpretation of the law. This is particularly so where, as here, "the defendant is prosecuted for engaging in activity without a license * * * and he shows that upon application for such a license to the proper authorities he was advised that no license was required” (LaFave and Scott, op cit., at 367).
When defendant applied for a Federal firearms license, he was instructed in a letter from the Bureau of Alcohol, Tobacco and Firearms that "additional state or local license is required for * * * New York * * * to sell handguns” (emphasis supplied). The Bureau of Alcohol, Tobacco and Firearms is the Federal agency that regulates gun dealers. Since the letter was signed by the Regional Regulatory Administrator, it was reasonable for defendant to believe that the signatory was "a public servant * * * empowered with the responsibility of administering” the law (Penal Law § 15.20 [2] [d]). The evidence adduced at trial indicated that defendant was not selling guns, that he did not intend to sell guns until he acquired a store. The guns he purchased during a four-month period were all accounted for, stored in original boxes in a closet. Thus, the plain words of the Regional Regulatory Administrator of the ATF misled defendant into believing that he needed a local license only to sell guns, that he did not need a local license to possess them. The three ATF booklets, containing 104 pages of Federal laws and regulations did not alert defendant that his possession of the guns was unlawful. A fourth ATF booklet, which contains a replication of 227 pages (in type less than one-sixteenth inch high) of State laws and published ordinances of 56 jurisdictions, further reinforced defendant’s mistaken belief. Penal Law articles 265 and 400, and the Administrative Code of the City of New York provide that a "dealer in firearms” needs local licenses. However, Administrative Code § 436-6.0 (5) states "Dealer in firearms shall not include a wholesale dealer.” It *333 was reasonable for defendant to believe that the inventory he bought in the wholesale market was excluded from local licensing provisions.
The People’s argument that defendant selectively interpreted portions of the law he thought exempted him from local licensing is unpersuasive. Rather, the defendant apparently is an otherwise law-abiding man who became ensnared in a rat’s nest of local, State and Federal regulations. His misfortune, perhaps, was that he read the rules and regulations too carefully and reasonably relied on their literal meaning. His reasonable reliance on those official statements of law provide him with a legally cognizable excuse for what would otherwise be criminal conduct.
While he was misled into violating a State statute by a Federal official, the licensing requirements of the multiple jurisdictions are inextricably intertwined and officials of the two sovereigns work so closely together that it is altogether understandable that even a well-intentioned, conscientious layman could get mixed up and confuse the two.
Penal Law § 25.00 (1) provides that where a defense is ordinary or other than affirmative, as here, the People must disprove it beyond a reasonable doubt.
CONCLUSION
Penal Law § 15.20 (2) is a "plain” or ordinary defense. As such the People have the burden of disproving it beyond a reasonable doubt (Penal Law § 25.00 [1]). I have evaluated the evidence and weighed the legal arguments; both sides make telling and persuasive points. However the result is somewhat of a standoff; while I am not persuaded of the defendant’s innocence neither am I convinced beyond a reasonable doubt that he wasn’t misled by "official statements] of the law * * * made or issued by * * * public servants] * * * legally charged * * * with the responsibility [of] * * * administering, enforcing and interpreting [the law]”. Studifin did everything reasonable to avoid running afoul of the law; he is a good man fallen victim to confusing laws and bad and misleading advice.
Since the People have failed to disprove the defense of mistake of law as occasioned by misleading official advice, I must and do find the defendant not guilty.

 I find the warrant was issued on probable cause. Ample support for that finding is found in the affidavit in support of the warrant setting forth the observations of the guns in defendant’s room by a disclosed informant, Bureau of Alcohol, Tobacco, and Firearms Inspector Kauffman. Whether the no-knock provision was proper is immaterial since the officers entered after knocking and announcing their identity and purpose.