COURT OF APPEALS OF VIRGINIA

Present:  Judges Fitzpatrick, Annunziata and Senior Judge Duff
Argued at Alexandria, Virginia


MARTIN M. MILLER
                                        OPINION BY
v.   Record No. 2040-96-4      JUDGE ROSEMARIE ANNUNZIATA
                                     NOVEMBER 4, 1997
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Robert W. Wooldridge, Jr., Judge

Judith M. Barger, Assistant Public Defender,
for appellant.

Marla Graff Decker, Assistant Attorney
General (James S. Gilmore, III, Attorney
General, on brief), for appellee.


Martin M. Miller was convicted for knowingly and intentionally possessing a firearm after having been previously convicted of a felony, in violation of Code § 18.2-308.2. Raising an issue of first impression in the Commonwealth, Miller argues that his conviction was obtained in violation of his right to due process of law.  We agree, reverse his conviction and dismiss the charge against him.

                        I.

Miller, a convicted felon, knew he was prohibited from possessing a firearm.  Knowing the prohibition extended to his hunting activities, Miller, a lifetime hunter, sold his hunting guns following his conviction.  He continued to hunt with a bow and arrows until his bow was stolen.

Wanting to pursue his sport, Miller sought to determine

whether he, as a convicted felon, could possess a muzzle-loading rifle. Miller knew that Virginia law distinguished muzzle-loading rifles from other guns. Specifically, he knew that Virginia did not require a criminal background check to be performed on individuals seeking to purchase muzzle-loading rifles. He also knew that Virginia defined different hunting seasons for and issued different licenses to hunters using muzzle-loading rifles.

Miller testified that he "talked to everyone who [he] thought might know the answer." He spoke with his probation officer, who told him he could have a muzzle-loading rifle. He also inquired of the Federal Bureau of Alcohol, Tobacco and Firearms (ATF) and the Virginia Department of Game and Inland Fisheries (VDGIF), and representatives from each, who knew Miller was a convicted felon, told him he could have a muzzle loader. Miller acknowledged that no one told him he could possess a "firearm" and that a muzzle loader was "in a sense" a firearm because "it fires." Relying on the interpretation provided by the government officials contacted, Miller purchased a muzzle loader and obtained a license to hunt with it. In short, Miller, a convicted felon, knowingly and intentionally possessed a muzzle-loading rifle.

Miller's possession of the muzzle loader was discovered by police officers during an unrelated search of the house in which Miller was living. Charged with possession of the gun as a

convicted felon under Code § 18.2-308.2, Miller argued at trial that his muzzle loader was not a "firearm" within the meaning of the statute. The trial court disagreed, and Miller has now abandoned that contention. Thus, for purposes of this appeal, we will assume without deciding that Miller's muzzle loader was a "firearm" within the meaning of Code § 18.2-308.2.

Miller argued at trial that his "good faith reliance" on the advice he received regarding the propriety of his possession of the muzzle loader, regardless of the accuracy of that advice, precludes his conviction. His argument is grounded in the due process clause of the Fourteenth Amendment. The trial court believed Miller's testimony concerning the content of the information he received but concluded that the sources of Miller's information were not sufficient to preclude his conviction on due process grounds.[1]

II.

---

[1] In particular, the court stated, "I don't believe that his conversations with ATF or [VDGIF] . . . come close to rising to the level of something upon which he could properly rely in his position." Continuing, the trial court stated that it was "much more concerned" about Miller's conversation with his probation officer. The court stated, "the probation officer acts in a much more direct way with this Defendant and is an arm of the Commonwealth for this Defendant's purposes." "But," the court found,

> I am unpersuaded actually, based upon the testimony that was provided, that the probation officer was in such a position relative to this Defendant that would rise to the level of the authorities in the cases in which this defense has been recognized.

- 3 -

Reflecting the axiom that everyone is "presumed to know the law," the common law rule that "ignorance of the law is no excuse" admitted of few exceptions. See People v. Studifin, 504 N.Y.S.2d 608, 609 (N.Y. Sup. Ct. 1986); Wimbish v. Commonwealth, 75 Va. 839, 844 (1880). The common law position was based on the fact that most common law crimes were malum in se. Studifin, 504 N.Y.S.2d at 609. Seen as "inherently and essentially evil . . . without any regard to the fact of [their] being noticed or punished by the law of the state," Black's Law Dictionary 959 (6th ed. 1990), ignorance of the prohibition of such crimes was simply untenable.

The rationale underlying the rule is less compelling for crimes that are malum prohibitum, viz., acts that are "wrong because prohibited," not by virtue of their inherent character. Black's Law Dictionary 960 (6th ed. 1990); see generally Studifin, 504 N.Y.S.2d at 609-10. Yet, the proposition that ignorance of the law is no excuse generally maintains with respect to crimes malum prohibitum, largely for pragmatic purposes. Studifin, 504 N.Y.S.2d at 610; see also 21 Am. Jur. 2d Criminal Law § 142 (1981) (Without the rule, "chaos and impossibility of law enforcement would ensue.") (citation omitted). Although leading at times to seemingly "unfair" results, rigid application of the rule promotes the policy it serves: "to encourage people to learn and know the law." E.g., Clark v. State, 739 P.2d 777, 779 (Ak. 1987); see also Wimbish,

75 Va. at 845; Oliver W. Holmes, The Common Law 48 (1881) ("It is no doubt true that there are many cases in which the criminal could not have known that he was breaking the law, but to admit the excuse at all would be to encourage ignorance where the law-maker has determined to make men know and obey . . . .").

Nonetheless, "[w]ith `the increasing complexity of law, the multiplication of crimes mala prohibita, and a more exact definition of fundamental principles of criminal liability,' certain exceptions to the general rule have emerged." Studifin, 504 N.Y.S.2d at 610 (citation omitted). It is such an exception that we address in the present case.[2]

The exception at issue addresses the legal consequences of a violation of the criminal law by an individual who takes measures to learn what conduct the government has proscribed, but is misadvised by the government itself. A number of states have adopted statutes bearing on the subject, but Virginia has not. See generally Jeffrey F. Ghent, Annotation, Criminal Law: "Official Statement" Mistake of Law Defense, 89 A.L.R.4th 1026 (1991).[3] Miller, thus constrained to rely on constitutional

_____

[2]The defense Miller advances has been characterized as "`a narrow exception to the general principle that ignorance of `the law is no defense,'" e.g., United States v. Aquino-Chacon, 109 F.3d 936, 938 (4th Cir. 1997) (quoting United States v. Etheridge, 932 F.2d 318, 321 (4th Cir. 1991)), which should be applied with "`great caution.'" United States v. Abcasis, 45 F.3d 39, 45 (2d Cir. 1995) (quoting United States v. Corso, 20 F.3d 521, 528 (2d Cir. 1994)).

[3]A typical formulation of the exception is reflected in § 2.04(3)(b) of the Model Penal Code, which provides that a belief that conduct does not legally constitute an offense is a

principles for his defense, contends that his prosecution and conviction for possessing a firearm violates his right to due process of law.

The defense Miller advances grew from a trilogy of United States Supreme Court cases, Raley v. Ohio, 360 U.S. 423 (1959); Cox v. Louisiana, 379 U.S. 559 (1965); United States v. Pennsylvania Chem. Corp., 411 U.S. 655 (1973) (PICCO). The defendants in Raley were called to answer questions before the Ohio State legislature's "Un-American Activities Commission." The chairman of the Commission apprised the defendants that, at the inquiry, they were entitled to rely upon the privilege against self-incrimination. A state immunity statute, however, deprived the defendants of the protection of the privilege. After relying upon the privilege, the defendants were indicted for failing to answer the Commission's questions. The Ohio Supreme Court held that the defendants were presumed to know that the law deprived them of the protection of the privilege and that, therefore, they had committed an offense by failing to answer the questions to which they asserted the privilege. The United States Supreme Court reversed the convictions, finding

(..continued)
defense to a prosecution for that offense based on such conduct when the defendant acts in reasonable reliance on an official statement of the law, afterward determined to be invalid or erroneous, contained in (1) a statute or other enactment; (2) a judicial decision, opinion, or judgment; (3) an administrative order or grant of permission; or (4) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration, or enforcement of the law defining the offense. Ghent, supra, at 1030.

- 6 -

that "the Chairman of the Commission, who clearly appeared to be the agent of the State in a position to give such assurances, apprised [the defendants] that the privilege in fact existed." 360 U.S. at 437. The Court further noted that "other members of the Commission and its counsel made statements which were totally inconsistent with any belief in the applicability of the immunity statute, and it is fair to characterize the whole conduct of the inquiry . . . as identical with what it would have been if Ohio had had no immunity statute at all." Id. at 438. The Court found the representations of the Commission "active[ly] misleading," not "simply vague or even contradictory," and although the representations were legally erroneous, the Commission was "the voice of the State most presently speaking to the [defendants]." Id. at 438-39. The Court concluded that to sustain the convictions "would be to sanction the most indefensible sort of entrapment by the State--convicting a citizen for exercising a privilege which the State clearly had told him was available to him." Id. at 438.

The defendant in Cox was convicted for demonstrating "near" a courthouse in violation of a Louisiana statute. The United States Supreme Court reversed the conviction, finding that "the highest police officials of the city, in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did." 379 U.S. at 571. The Court noted the "lack of specificity" in the use of the word "near" in the

statute, which the court found "foresees a degree of on the spot administrative interpretation by officials charged with responsibility for administering and enforcing it." Id. at 568. The Court found it apparent that demonstrators "would justifiably tend to rely on [an] administrative interpretation of how `near' the courthouse a particular demonstration might take place." Id. at 569. Applying Raley, the Court reversed the defendant's conviction for demonstrating "near" the courthouse after he had been told that his demonstration was not "near" the courthouse. Id. at 571.

The defendant corporation in PICCO was convicted for discharging industrial refuse into a river, in violation of § 13 of the Rivers and Harbors Act of 1899. In its regulations promulgated under the Act, the Army Corps of Engineers had consistently construed § 13 as limited to discharges that affected navigation. PICCO's discharge was such that it would not affect navigation. Relying on Raley and Cox, the Court reversed the conviction, finding

> [t]here can be no question that PICCO had a right to look to the Corps of Engineers' regulations for guidance. The Corps is the responsible administrative agency under the 1899 Act, and "the rulings, interpretations and opinions of the [responsible agency] . . . , while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance." Moreover, although the regulations did not of themselves purport to create or define the statutory offense in question, it is certainly true that their designed purpose was to guide persons as to

- 8 -

the meaning and requirements of the statute.

411 U.S. at 674 (citations omitted).  The Court remanded the case for a determination of whether PICCO's reliance was reasonable.

The defense derived from the Raley, Cox, PICCO trilogy applies where a defendant has reasonably relied upon affirmative assurances that certain conduct is lawful, when those assurances are given by a public officer or body charged by law with responsibility for defining permissible conduct with respect to the offense at issue.  The defense is a due process defense, Raley, 360 U.S. at 437; Cox, 379 U.S. at 571, grounded in "traditional notions of fairness inherent in our system of criminal justice."  PICCO, 411 U.S. at 674; United States v. Caron, 64 F.3d 713, 715 (1st Cir. 1995) (applying standard of fundamental fairness), modified in part on other grounds, 77 F.3d 1 (1st Cir. 1996), cert. denied, 116 S. Ct. 2569 (1996); United States v. Howell, 37 F.3d 1197, 1204 (7th Cir. 1994); United States v. Austin, 915 F.2d 363, 366 (8th Cir. 1990); United States v. Hedges, 912 F.2d 1397, 1405 (11th Cir. 1990); United States v. Conley, 859 F. Supp. 909, 932 (W.D. Pa. 1994); United States v. Brady, 710 F. Supp. 290, 295 (D. Colo. 1989).  See generally Sean Connelly, Bad Advice: The Entrapment by Estoppel Doctrine in Criminal Law, 48 U. Miami L. Rev. 627, 632 (1994) (characterizing Raley and Cox as grounded in "substantive due process" analysis).

Raley relied on prior United States Supreme Court cases

addressing elementary notions of fairness in the criminal process, and emphasized that "criminal sanctions are not supportable if they are to be imposed under `vague and undefined' commands (citing <u>Lanzetta v. New Jersey</u>, 306 U.S. 451 (1939)); or if they are `inexplicably contradictory' (citing <u>United States v. Cardiff</u>, 344 U.S. 174 (1952)); and certainly not if the Government's conduct constitutes `active misleading' (citing <u>Johnson v. United States</u>, 318 U.S. 189, 197 (1943))." <u>United States v. Laub</u>, 385 U.S. 475, 487 (1967).

The due process argument is, in essence, "that the criminal statute under which the defendant is being prosecuted cannot constitutionally be applied to the defendant without violating due process of law, where government officials have misled the defendant into believing that his conduct was not prohibited." Ghent, <u>supra</u>, at 1031; <u>see also</u> <u>Studifin</u>, 504 N.Y.S.2d at 610 ("[F]or the state to prosecute someone for innocently acting upon such mistaken advice is akin to throwing water on a man and arresting him because he's wet.").[4]

---

[4]The defense has come to be known as "entrapment by estoppel," although it is neither "entrapment," <u>see</u> Note, <u>Applying Estoppel Principles in Criminal Cases</u>, 78 Yale L.J. 1046, 1046-47 (1969), nor "an estoppel at all in any meaningful sense." <u>Brady</u>, 710 F. Supp. at 295. Indeed, the Supreme Court has never used the term "entrapment by estoppel." Moreover, neither <u>Raley</u> nor <u>Cox</u> use the word "estoppel," and it remains unclear whether the Supreme Court considers <u>PICCO</u> to have been decided on estoppel grounds. <u>Compare</u> <u>Heckler v. Community Health Services</u>, 467 U.S. 51, 60 n.12 (1984) (suggesting <u>PICCO</u> decided on estoppel grounds), <u>with</u> <u>id.</u> at 68 (Rehnquist, J., concurring in the judgment) (stating that <u>PICCO</u> was not an estoppel case).

The "entrapment by estoppel" misnomer inhibits clear

The ultimate due process inquiry is whether a defendant's conviction, for reasonably and in good faith doing that which he was told he could do, is fundamentally unfair in light of the content of the information he received and its source. The cases addressing the defense demonstrate that the defendant must establish, as a threshold matter, the legal sufficiency of the content and source of the information received. See PICCO, 411 U.S. at 674-75 (establishing threshold determination that defense was legally "available"). The application of the defense then requires a factual determination whether the defendant's reliance upon the information received was reasonable and in good faith.

See id.[5] The defendant bears the burden of establishing the
(..continued)
analysis and application of the defense, because the use of the word "estoppel" unnecessarily places the due process basis for the defense in conflict with the well-established principle that "the Government may not be estopped on the same terms as any other litigant." Heckler, 467 U.S. at 60; see also Sink v. Commonwealth, 13 Va. App. 544, 548, 413 S.E.2d 658, 660 (1992) ("[T]he doctrine of estoppel does not prevent the Commonwealth from enforcing laws in its governmental function."). Furthermore, the use of the word "estoppel" improvidently suggests that the dispositive analysis is grounded in the application of agency principles rather than constitutional concerns. See Brady, 710 F. Supp. at 295 ("[T]he doctrine stems from the due process clause, not from the common law of contract, equity or agency."); see also Austin, 915 F.2d at 366 (same); Conley, 859 F. Supp. at 932 ("The focus of the Due Process inquiry into fundamental fairness and substantial justice . . . should not be arbitrarily constrained by concepts taken from other contexts such as estoppel, actual authority or deterrence.").

[5]Of course, the reasonableness of a defendant's reliance is inextricably linked to the content of the information received and its source. See, e.g., Howell, 37 F.3d at 1204 (Reliance must be reasonable "in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation."). Ultimately, however, "reasonableness" can

affirmative defense.  See id. at 675; Howell, 37 F.2d at 1205.[6]

With respect to content, the defense is available only where the information upon which the defendant has relied is an affirmative assurance that the conduct giving rise to the conviction is lawful.  In the absence of such an affirmative assurance, the due process concerns that the defense is designed to protect are not implicated, and the defense fails.  See Aquino-Chacon, 109 F.3d at 939; United States v. Lowenstein, 108 F.3d 80, 83 (6th Cir. 1997); United States v. Trevino-Martinez, 86 F.3d 65, 69 (5th Cir. 1996), cert. denied, 117 S. Ct. 1109 (1997); United States v. Neville, 82 F.3d 750, 761-62 (7th Cir.), cert. denied, 117 S. Ct. 249 (1996); United States v. Achter, 52 F.3d 753, 755 (8th Cir. 1995); United States v. French, 46 F.3d 710, 714 (8th Cir. 1995); Howell, 37 F.3d at 1205; United States v. Meraz-Valeta, 26 F.3d 992, 996 (10th Cir. 1994); United States

(..continued)
be determined only after a finding that the content and source of the information are legally sufficient to invoke due process concerns.

[6]We note that the seriousness of the crime at issue as well as other policy concerns may preclude the application of the defense as a matter of law.  See Cox, 379 U.S. at 569 ("Obviously telling demonstrators how far from the courthouse steps is 'near' the courthouse for purposes of a permissible peaceful demonstration is a far cry from allowing one to commit, for example, murder, or robbery."); Connelly, supra, at 636 (explaining that even where the technical elements of the defense are found, the court could still refuse to apply the defense when policy considerations so demand).  See generally Note, supra, at 1060 (discussing nature of the offense at issue).  Indeed, we believe it could scarcely be said that an individual could reasonably and in good faith rely on advice condoning the commission of a serious crime.  We find the present case to invoke no such concern.

- 12 -

v. Trancoso, 23 F.3d 612, 615 (1st Cir. 1994); United States v. Nichols, 21 F.3d 1016, 1018 (10th Cir. 1994); United States v. Corso, 20 F.3d 521, 528 (2d Cir. 1994); United States v. Woodley, 9 F.3d 774, 779 (9th Cir. 1993); United States v. Bazargan, 992 F.2d 844, 849 (8th Cir. 1993); United States v. Clark, 986 F.2d 65, 69 (4th Cir. 1993); United States v. Long, 977 F.2d 1264, 1270-71 (8th Cir. 1992); United States v. LaChapelle, 969 F.2d 632, 637 (8th Cir. 1992); United States v. Hurst, 951 F.2d 1490, 1499 (6th Cir. 1991); United States v. Brebner, 951 F.2d 1017, 1025 (9th Cir. 1991); United States v. Smith, 940 F.2d 710, 715 (1st Cir. 1991); United States v. Paez, 866 F. Supp. 62, 66 (D.P.R. 1994); Conley, 859 F. Supp. at 934.

As to the source of the information, it must be established that the information was received from a "government official." See Clark, 986 F.2d at 69 (taxidermist not government official); United States v. Indelicato, 887 F. Supp. 23, 25 (D. Mass. 1995), modified in part on other grounds, 97 F.3d 627 (1st Cir. 1996), cert. denied, 117 S. Ct. 1013 (1997) (private attorney not government official). Compare Howell, 37 F.3d at 1206 (private firearms dealer licensed by government not government official), United States v. Billue, 994 F.2d 1562, 1568-69 (11th Cir. 1993) (same), and Austin, 915 F.2d at 366-67 (same), with United States v. Tallmadge, 829 F.2d 767, 774 (9th Cir. 1987) (firearms licensee is government official). Indeed, "[t]his is necessary as a matter of constitutional law because the Due Process Clause

. . . is limited to `state action.'"  Connelly, supra, at 633.

However, a government official's status as "state actor" has not alone been sufficient to invoke the defense in cases recognizing its availability.  The issue is not whether an "agent" of the state has bound the government by his or her word.  The issue is whether convicting an individual who has reasonably relied on the advice of a state actor is so fundamentally unfair as to raise due process concerns.  Such concerns are implicated only when the source of the information is a public officer or body charged by law with responsibility for defining permissible conduct with respect to the offense at issue.  See Raley, 360 U.S. at 439 (source of information was Commission conducting inquiry at which defendants asserted privilege against self-incrimination); Cox, 379 U.S. at 568 (sources of information were highest police officials of city, who were "charged with responsibility for administering and enforcing" statute by virtue of legislature's use of word "near," which "fore[saw] a degree of on-the-spot administrative interpretation" of permissible conduct); PICCO, 411 U.S. at 674 (source was Corps of Army Engineers, which was "the responsible administrative agency under the [Act defining the offense]" and whose "`rulings, interpretations and opinions . . . constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance'" as to what conduct was permissible); Abcasis, 45 F.3d at 43 (source was law enforcement

- 14 -

agent who allegedly solicited defendant to engage in otherwise criminal conduct as a cooperating informant); United States v. Thompson, 25 F.3d 1558, 1565 (11th Cir. 1994) (same); Hedges, 912 F.2d at 1405 (source was Air Force Standards of Conduct Officer who by regulations and direct orders was charged with advising officer personnel of conflict of interest problems and who allegedly advised defendant prosecuted under conflict of interest statute that his conduct did not amount to a conflict of interest); Brady, 710 F. Supp. at 295 (source was state judge who had constitutional duty to interpret and apply federal law); Commonwealth v. Twitchell, 617 N.E.2d 609, 619 (Mass. 1993) (source was State Attorney General, who was "the chief law officer of the Commonwealth, with the power to set a unified and consistent legal policy for the Commonwealth," was "statutorily empowered to `give his opinion upon questions of law submitted to him,'" and was "acting in an area of his official responsibilities" in issuing opinion upon which defendants allegedly relied); Tallmadge, 829 F.2d at 774 (source was federal firearms licensee charged by Congress with affirmative duty to question customers concerning criminal record and required by Treasury Department to inform buyers concerning the restrictions imposed by Congress on the purchase of firearms).[7]

Many cases involve a defendant who seeks to invoke the

_____

[7]But see Howell, 37 F.3d at 1206 (private firearms dealer not even "state actor"); Billue, 994 F.2d at 1568-69 (same); Austin, 915 F.2d at 366-67 (same).

- 15 -

defense as a bar to prosecution by one sovereign for advice received from an official of another sovereign.  The defense has been nearly universally rejected in this dual-sovereign context.  See generally Caron, 64 F.3d at 715-16.  The only exceptions are cases where a defendant has relied on the advice of a state judge with respect to federal law.  These cases are thought to raise sufficient fairness concerns to warrant application of the defense as a bar to federal prosecution.  Compare Brady, 710 F. Supp. at 295, with United States v. Etheridge, 932 F.2d 318, 321 (4th Cir.), and United States v. Bruscantini, 761 F.2d 640, 642 (11th Cir.).  Brady, which applied the defense, addressed the fairness concerns inherent in that context by virtue of the state court judge's constitutional duty to interpret and apply federal law.  Conversely, Bruscantini and Etheridge concluded that the dual-sovereignty context eviscerated the fairness concerns giving rise to the defense.

> The rule of Cox and Raley is a narrow
> exception to the general principle that
> ignorance of the law is no defense.  It was
> prompted by the Court's observation that
> permitting the government to prosecute
> individuals who reasonably rely upon that
> government's interpretation of the law would
> constitute a kind of entrapment.  Where,
> however, the government that advises and the
> government that prosecutes are not the same,
> the entrapment problem is different.

Etheridge, 932 F.2d at 321 (quoting Bruscantini, 761 F.2d at 641-42).[8]

---

[8]Both Brady and Bruscantini were decided on fairness grounds, notwithstanding Brady's criticism of Bruscantini as

- 16 -

III.

In the present case, the trial court found that Miller's probation officer and representatives from ATF and VDGIF told Miller that he could possess a muzzle-loading rifle.[9] The trial court concluded that Miller had established the legal sufficiency of the content of the information he received, viz., an affirmative assurance that certain conduct--his possession of the muzzle loader--was lawful. Cf. Aquino-Chacon, 109 F.3d at 939 (explaining that defendant must show more than "vague or even contradictory" statements by government; must demonstrate that there was "active misleading"); Clark, 986 F.2d at 69 (holding observation upon which defendant allegedly relied not an "assurance").

Moreover, there can be no doubt that the sources upon which appellant relied--a federal ATF agent, a VDGIF agent, and his probation officer--were "state actors." Cf. Clark, 986 F.2d at 69 (taxidermist not government official); Indelicato, 887 F. Supp. at 25 (private attorney not government official). The determinative issue, therefore, is whether these sources were legally sufficient to invoke the due process defense, viz., whether the sources were charged by law with responsibility for

(..continued)
relying on agency principles.

[9]Contrary to the Commonwealth's contention, the trial court admitted for the truth of the matter asserted appellant's testimony as to what his probation officer told him. The trial court deemed the hearsay to be an admission by the Commonwealth.

defining permissible conduct with respect to offense for which Miller was convicted.[10]

We hold that Miller's case fails as a matter of law with respect to the ATF agent and the VDGIF agent. Neither of those agents was charged by law with responsibility for defining permissible conduct under Code § 18.2-308.2. The ATF agent, although arguably charged with such responsibility under federal firearms laws, has no such duty with respect to Virginia law. The ATF officer's opinion as to whether Miller could possess a muzzle loading rifle under Virginia law simply does not invoke due process concerns in the Commonwealth of Virginia's bid to prosecute Miller. See Etheridge, 932 F.2d at 321; Bruscantini, 761 F.2d at 642; Brady, 710 F. Supp. at 295. Likewise, the Commonwealth of Virginia has not charged the VDGIF with the duty of defining permissible conduct under Code § 18.2-308.2. The VDGIF exists to provide public, informational and educational services related to Title 29.1, which concerns Game, Inland Fisheries and Boating. See Code § 29.1-109.[11] It is the agency

---

[10]Indeed, we find this to have been precisely the issue upon which the trial court disposed of the case. The trial judge found that the officials who advised Miller did not "rise to the level" of the authorities "upon which he could properly rely."

[11]Code § 29.1-109 provides:

> A. The Department of Game and Inland Fisheries shall exist to provide public, informational and educational services related to this title, and to serve as the agency responsible for the administration and enforcement of all rules and regulations of the Board, the statutory provisions of this

responsible for the administration and enforcement of all rules

and regulations of Title 29.1 and related acts, but it is not
(..continued)
title, and related legislative acts.

B. The Board shall appoint a Director to head the Department and to act as principal administrative officer. In addition to the powers designated elsewhere in this title, the Director shall have the power to:

1. Enforce or cause to be enforced all laws for the protection, propagation and preservation of game birds and game animals of the Commonwealth and all fish in the inland waters thereof. Inland waters shall include all waters above tidewater and the brackish and freshwater streams, creeks, bays, including Back Bay, inlets, and ponds in the tidewater counties and cities.

2. Initiate prosecution of all persons who violate such laws, and seize and confiscate wild birds, wild animals and fish that have been illegally killed, caught, transported or shipped.

3. Employ persons necessary for the administrative requirements of the Board and to designate the official position and duties of each. The salaries of all such employees shall be as provided in accordance with law.

4. Perform such acts as may be necessary to the conduct and establishment of cooperative fish and wildlife projects with the federal government as prescribed by acts of Congress and in compliance with rules and regulations promulgated by the Secretary of Interior.

5. Make and enter into all contracts and agreements necessary or incidental to the performance of his duties and the execution of his powers, including, but not limited to, contracts with the United States, other state agencies and governmental subdivisions of the Commonwealth.

charged with defining what conduct Code § 18.2-308.2 proscribes. Thus, the opinion of VDGIF with respect to the permissibility of Miller's possessing a muzzle loader does not implicate due process concerns. Cf. PICCO, 411 U.S. at 674; Cox, 379 U.S. at 568; Raley, 360 U.S. at 439.

By contrast, however, Miller's probation officer was charged by the Commonwealth with responsibility for defining Miller's permissible conduct with respect to Code § 18.2-308.2. The legislature granted the probation officer supervisory

responsibility for Miller's conduct and treatment during the course of his probation, see Code § 53.1-145,[12] including the

[12]Code § 53.1-145 provides:

> In addition to other powers and duties prescribed by this article, each probation and parole officer shall:
>
> 1. Investigate and report on any case pending in any court or before any judge in his jurisdiction referred to him by the court or judge;
>
> 2. Except those persons placed in probation supervision programs established under §§ 53.1-181 and 53.1-182.1, supervise and assist all persons within his territory placed on probation or post-release supervision pursuant to § 19.2-295.2, secure, as appropriate and when available resources permit, placement of such persons in a substance abuse treatment program which may include utilization of acupuncture and other treatment modalities, and furnish every such person with a written statement of the conditions of his probation or post-release supervision and instruct him therein;
>
> 3. Supervise and assist all persons within his territory released on parole, secure, as appropriate and when available resources permit, placement of such persons in a substance abuse treatment program which may include utilization of acupuncture and other treatment modalities, and, in his discretion, assist any person within his territory who has completed his parole or has been mandatorily released from any correctional facility in the Commonwealth and requests assistance in finding a place to live, finding employment, or in otherwise becoming adjusted to the community;
>
> 4. Arrest and recommit to the place of confinement from which he was released, or in which he would have been confined but for the suspension of his sentence or of its imposition, for violation of the terms of

- 21 -

responsibility for arresting him for a violation of his probation.  Violation of the law regarding the possession of a firearm by a convicted felon was surely one.  It follows that a probation officer, statutorily required to supervise, assist, and provide a probationer with a statement of the conditions of his

(..continued)

> probation, post-release supervision pursuant to § 19.2-295.2 or parole, any probationer, person subject to post-release supervision or parolee under his supervision, or as directed by the Chairman, Board member or the court, pending a hearing by the Board or the court, as the case may be;
>
> 5. Keep such records, make such reports, and perform other duties as may be required of him by the Director or by regulations prescribed by the Board of Corrections, and the court or judge by whom he was appointed;
>
> 6. Order and conduct, in his discretion, drug and alcohol screening tests of any probationer, person subject to post-release supervision pursuant to § 19.2-295.2 or parolee under his supervision who the officer has reason to believe is engaged in the illegal use of controlled substances or marijuana or the abuse of alcohol.  The cost of the test may be charged to the person under supervision.  Regulations governing the officer's exercise of this authority shall be promulgated by the Board; and
>
> 7. Have the power to carry a concealed weapon in accordance with regulations promulgated by the Board and upon the certification of appropriate training and specific authorization by a judge of the circuit court to which the officer is assigned.
>
> Nothing in this article shall require probation and parole officers to investigate or supervise cases before juvenile and domestic relations district courts.

release from confinement, as well as to arrest a probationer for a violation of the terms of his release, is, a fortiori, charged by law with defining a probationer's permissible or impermissible conduct. The authority to enforce the law and effect an arrest, of necessity, requires an interpretation of what constitutes permissible conduct. For these reasons, we hold that the trial court erroneously concluded that Miller's probation officer was not a source legally sufficient to invoke the Due Process Clause as a bar to his prosecution and conviction.

It remains only to be determined whether, based on the totality of the circumstances, Miller's reliance on the advice of his probation officer was reasonable and in good faith. Upon review of the uncontradicted evidence in this case, we find, as a matter of law, that it was.

Miller's conviction is accordingly reversed, and the case dismissed.

Reversed and dismissed.