COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Chief Judge Decker, Judges Malveaux and Causey
Argued at Richmond, Virginia

RONALD DEAN NORTHCRAFT

v.      Record No. 1067-21-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE MARY BENNETT MALVEAUX
SEPTEMBER 26, 2023

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
W. Reilly Marchant, Judge

Samantha Offutt Thames, Senior Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

A jury convicted Ronald Dean Northcraft ("appellant") of three counts of grand larceny of a

motor vehicle, in violation of Code § 18.2-95, five counts of unlawfully obtaining documents from

the Department of Motor Vehicles ("DMV"), in violation of Code § 46.2-105.2(A), five counts of

making a false statement on an application for a certificate of title, in violation of Code § 46.2-605,

one count of money laundering, in violation of Code § 18.2-246.3(A), and one count of attempted

money laundering, in violation of Code §§ 18.2-26, -246.3(A).  On appeal, he argues that the trial

court erred in: (1) failing to strike a juror for cause, (2) denying his motions to strike the evidence on

all charges, and (3) denying his proposed jury instructions.  For the following reasons, we affirm.

## I.  BACKGROUND

### Virginia's Abandoned Vehicle Process

Code §§ 46.2-1200 through -1207 establish Virginia's abandoned vehicle process

("AVP") allowing applicants to dispose of an abandoned motor vehicle, trailer, or manufactured

home left on a highway, public property, or private property.  An applicant initiates the process by completing an online application for an abandoned vehicle record request through the DMV's website.  After the online application is submitted, the DMV conducts a record search and sends a certified letter to the vehicle's owner or lienholder.  *See* Code § 46.2-1202(A) (directing that "[a]ny person in possession of an abandoned motor vehicle shall initiate with the [DMV], in a manner prescribed by the Commissioner, a search for the owner and/or lienholder of record of the vehicle").[1]  The notice letter advises the vehicle's owner or lienholder that the AVP is in progress for the vehicle and that they have 15 days from the date of notice to reclaim and remove the vehicle.  Code § 46.2-1202(B).  If the vehicle remains unclaimed following the 15-day notice period, the owner or lienholder "shall have waived all right, title, and interest" in the vehicle.  *Id.*

After the 15-day reclamation period expires, the applicant seeking title to an abandoned vehicle must post an "intent to auction" notice on the DMV website for at least 21 days.  *See* Code § 46.2-1202.1.  Once the 21-day "intent to auction" notice period expires, the applicant may obtain title to the vehicle.

At trial, Alacia Moore, the DMV employee in charge of the agency's AVP, testified about the online record request application as it existed in 2018.[2]  When an AVP applicant initiated the record request on the DMV's website, the website told the applicant to "[u]se this transaction to . . . [o]btain title for or sell an abandoned vehicle . . . in your possession."  After viewing this information, applicants then entered the vehicle's Vehicle Identification Number

---

[1] Virginia's AVP statutes were amended in 2020 and 2021.  *See* 2020 Va. Acts chs. 964, 965; 2021 Va. Acts Spec. Sess. I ch. 374.  The amendments did not substantively change the language relevant here, and we cite the versions of the statutes in effect when the offenses occurred.

[2] The Commonwealth also introduced a series of slides showing how an online record request application would have been completed in 2018.

("VIN").[3]  They next chose from three options indicating that they were "in possession of a motor vehicle" that "[1] [w]as left unattended on public property for more than 48 hours in violation of a state law or local ordinance[,] [2] has remained for more than 48 hours on private property without the consent of the property's owner . . . [,] [or] [3] was left unattended on the shoulder of a primary highway."  To continue with the application, the applicant had to then certify that the information they provided in their application was "true and correct."  Following this, after the applicant paid a fee, the DMV would process the transaction, and a record request receipt was generated that contained the vehicle's information.

After an applicant completed the online record request application, the DMV required an applicant to produce three documents at a DMV customer service center in order to process a title for vehicles obtained via the AVP: (1) an application of certificate for title, (2) a vehicle removal certificate, and (3) the record request receipt.  The application for certificate of title is the application form used to apply for the title to an abandoned vehicle.  This form requires an applicant to list the vehicle owner's contact information.  It also includes a certification section where the applicant affirms that "all information presented in this form is true and correct, that any documents I . . . have presented to DMV are genuine, and that the information included in all supporting documentation is true and accurate."  The vehicle removal certificate is the transfer of ownership document used for abandoned vehicles.  The top section of the form requires the applicant to state where the vehicle is located and the address of the "person/authorized agent in possession of vehicle."

After an applicant presented a record request receipt, an application for certificate of title, and a vehicle removal certificate, a DMV customer service representative processed the

_____

[3] Moore testified that a VIN is a number used to identify a particular vehicle.  At trial, a car dealership parts manager testified that an individual could find the VIN for a particular vehicle by looking at the VIN plate visible through a vehicle's windshield.

documents, collected any fees, and gave the vehicle's title over to the applicant. Once an applicant was issued the title, the DMV recorded that individual as the owner of the vehicle.

When processing these documents, the DMV customer service representative did not have access to the information provided on the online record request application. Moore testified that the DMV's role in the AVP was "just to implement the process" and that the DMV did not "have a role in making sure that the person who applies is who is allowed to apply."

Moore further testified that anyone could use the AVP "[a]s long as they are in possession and meet the requirements" and that the program was not limited to local governments. But Moore also testified that it was her understanding that if a vehicle was abandoned on public property, the program was intended for local governments' use. She acknowledged that in 2018 there was no information provided during the process indicating that the AVP for vehicles on public property was limited solely to local governments.[4]

The Offenses

In May and early June of 2018, appellant completed an online record request application for five vehicles: a 2006 Kia Optima, a 2016 Mini Cooper, a 2014 Chevrolet Camaro, a 2009 Mini Cooper, and a 2012 Toyota Camry. On his applications, appellant stated that the vehicles were respectively located on the following public streets: 5400 Montbrook Circle; 2234 Park Avenue; 700 North Davis Street; "Grove Avenue/Roseneath"; and "Hancock Street." On each online record request application, appellant listed his reason for possession as "possession of a

---

[4] Moore acknowledged that the AVP procedure had changed since 2018. Currently, a private individual may only use the online record request application if they are in possession of a vehicle that had remained for more than 48 hours on private property without the consent of the property's owner; the other two AVP options, a vehicle on public property or on the shoulder of a highway, are limited to use by government localities. *See* Code § 46.2-1200.3 (effectuated January 1, 2022 and providing that "[n]o person may remove or sell any abandoned vehicle left on public property or the shoulder of a primary highway unless such person is acting pursuant to an agreement for such removal or sale with a local government entity or law-enforcement agency and has actual possession of the vehicle").

motor vehicle . . . that was left unattended on public property for more than 48 hours in violation of a state law or local ordinance."

Nathaniel White, Rebecca Shaw, Austin McCune, Billy Gilmore, and Altonia Foster were the owners of vehicles connected with appellant's online record request applications. From May through July 2018, these individuals usually parked their vehicles on the public streets listed on appellant's online record request applications.[5] At least four of the owners did not have current registration stickers displayed on their vehicles during this time. In July 2018, four of the owners noticed that the vehicles were not where they usually parked them.[6] Three of the vehicles were never returned to their owners, and one vehicle was returned to its owner months after it went missing.

The DMV sent notice letters to each owner at their last known address informing them that appellant was claiming that he was in possession of their vehicles and was seeking to have them declared abandoned. Each individual testified that they had not given appellant possession or ownership of their vehicle.

On July 6, 2018, appellant filled out an application for certificate of title and vehicle removal certificate for the 2006 Kia Optima and 2016 Mini Cooper, and on July 12, 2018 he filled out these same forms for the 2014 Chevrolet Camaro, the 2009 Mini Cooper, and the 2012 Toyota Camry. On the applications for certificate of title, appellant listed himself as the owner of the vehicles. On all five vehicle removal certificates, appellant listed himself as the "person/authorized agent in possession of vehicle."

---

[5] Because he was ill at this time, Gilmore's vehicle was driven by his wife, Mildred Gilmore.

[6] McCune's vehicle was never taken from him.

- 5 -

On July 6, 2018, Shakeima Chisholm, a DMV employee, processed appellant's applications for certificates of title for the 2006 Kia Optima and 2016 Mini Cooper. Chisholm thought it was unusual that appellant possessed two abandoned vehicles and asked him if he worked for a towing company or dealership. Appellant responded that he did not and said that the vehicles had been left on his property. Chisholm processed the applications and gave appellant the titles to the two vehicles. Although Chisholm thought it "odd that it was two abandoned vehicles on someone's property," she testified that if someone had all the necessary paperwork to complete the application for certificate of title, she was unable to reject the application even if she thought "something might not be right on the form."

On July 12, 2018, Ebony Bell, another DMV employee, processed appellant's applications for certificates of title for the 2014 Chevrolet Camaro, the 2012 Toyota Camry, and the 2009 Mini Cooper. Bell thought that appellant's applications were "unusual" because he used the AVP for three vehicles all at once and because the vehicles were all less than ten years old. In her experience, the AVP was used "for much older vehicles being left on the property." She asked appellant if the vehicles were located on his property, and he said yes and that the vehicles "were just left on his property." Before she gave appellant the titles, she spoke with her manager and was told to process the applications because appellant's paperwork was in order. Bell issued titles for the three vehicles to appellant.

Also on July 12, 2018, appellant ordered a replacement key for the 2009 Mini Cooper.

Dwaine Tolliver, the owner of Autosource, LLC, auctioned vehicles on behalf of others for a portion of the proceeds. His business sold the vehicles through Richmond Auto Auction. He entered into an agreement with appellant to auction two vehicles, the 2009 and 2016 Mini Coopers. Appellant brought the vehicles to Tolliver and gave the vehicles' titles to him. On July 20, 2018, the 2009 Mini Cooper was sold at auction by Tolliver for about $4,800. That same

day, Tolliver tried to sell the 2016 Mini Cooper at auction. Richmond Auto Auction informed Tolliver that the vehicle had been reported stolen, and the vehicle was not auctioned. The vehicle was left at the auction by Tolliver, and he never received money for it. Tolliver also returned the money received for the 2009 Mini Cooper to Richmond Auto Auction after the second car was identified as stolen.

Detective Alexandra Davila with the Richmond City Police Department began investigating the case after receiving multiple reports of stolen vehicles. Davila contacted appellant and told him she had received reports of stolen vehicles along with notice letters from the DMV indicating that he was the person the owners needed to contact. Appellant told her that the "vehicles were his, and in his possession, and he had obtained them legally." After obtaining a search warrant, Davila searched appellant's home. During the search, Davila found the 2009 Mini Cooper's license plate, along with several items that Shaw, the owner of the vehicle, identified as personal items she had left in the Mini Cooper.

After the Commonwealth presented its case-in-chief, appellant moved to strike the evidence on all of the offenses. The trial court denied appellant's motions to strike. Appellant did not present any evidence.

Appellant was convicted by the jury on all offenses. Appellant filed a motion to set aside the money laundering and attempted money laundering convictions, which the court denied. This appeal followed.

## II. ANALYSIS

### A. Motion to Strike Juror

During voir dire, the trial court asked the venire preliminary questions about the presumption of innocence and the requirement to remain impartial and without bias to both appellant and the Commonwealth. Counsel for appellant then questioned the venire, asking, "Is

there anyone through hearing that the [Commonwealth] has charged [appellant] with 15 felony charges, so we are here for 15 separate felonies, who feels that [appellant] must have done something wrong?" In response, one juror said, "That actually was my initial thought when I first heard it is that I can understand one, maybe two . . . . But 15 felonies is just not, to me, an accident." When asked if anyone else felt the same, Juror R.[7] raised her hand. Counsel for appellant asked Juror R., "do you feel as though you are going to be able to set aside that initial reaction?" She responded, "I have set it aside."

The following exchange then occurred between counsel for appellant, Juror R., and the trial court:

> [DEFENSE ATTORNEY]: So we were talking a little bit before the fact that [appellant] is charged and how that kind of gave you an initial reaction. So [the trial court] instructed you that you are not to consider and you will be instructed from the jury [sic] that you are not to consider the fact that he is charged as evidence against him. Do you think you will be able to set aside that initial reaction?
>
> [JUROR R.]: I don't know, because it kind of confused me. It seemed like a tow truck driver was taking (inaudible). You understand what I am saying?
>
> THE COURT: Well, see, that's the thing--
>
> [JUROR R.]: And I have gave away a salvage car before.
>
> [DEFENSE ATTORNEY]: Okay.
>
> [JUROR R.]: It just broke down, and I just called the tow truck people to come and get it and I salvaged it to them. I couldn't deal with it. It was just kind of hard.
>
> [DEFENSE ATTORNEY]: And I know it is especially hard, because we were just giving you little tidbits of what the evidence is going to be. But, I guess, the question that I am asking is your initial reaction to the number of charges was that he must have done something wrong. Am I correct on saying that?

---

[7] We use the juror's initial to protect her privacy.

[JUROR R.]: Yes.

[DEFENSE ATTORNEY]: But do you think that you would be able to set aside that initial reaction if you are--

[JUROR R.]: I guess I will have to listen to the evidence.

[DEFENSE ATTORNEY]: So you think you could--

[JUROR R.]: (Inaudible) but I know I have to listen to the evidence, though. But it kind of would still be in my head.

[DEFENSE ATTORNEY]: I appreciate that.

[JUROR R.]: I don't want to--

THE COURT: Well, if I instruct you it's not to be considered--

[JUROR R.]: Right.

THE COURT: --would you be able to follow the law?

[JUROR R.]: Yes.

THE COURT: I mean, there are a lot of facts here. And it is tough on you all to make -- answer some of these questions, because you don't know the facts of the case.

[JUROR R.]: Yes.

THE COURT: They just give you a little snippet and you started thinking this and you find out later, well, maybe--

[JUROR R.]: Right.

THE COURT: But the key -- Because you don't know the facts, the key is if I tell you the law, do not infer the fact that he is charged, and has been indicted, and is on trial, don't infer that he is guilty. You can only find him guilty based on the law and the evidence.

[JUROR R.]: Right.

THE COURT: Can you apply that fairly?

[JUROR R.]: Yes.

THE COURT: You wouldn't say I can't apply that--

[JUROR R.]: No, no. That is your rule, and I have to do it the way you say do it.

- 9 -

THE COURT: Okay. Well, that's fine.

[JUROR R.]: Yes.

THE COURT: I don't want to put words in your mouth. I want you to understand that that's the process.

[JUROR R.]: I understand.

THE COURT: Okay.

The Commonwealth asked no further questions of Juror R. Counsel for appellant moved to strike Juror R. for cause, which the court denied.

On appeal, appellant argues that the trial court erred in not striking Juror R. for cause because her voir dire demonstrated that she could not set aside the number of charges appellant was facing and the implication that this meant he must have done something wrong. Appellant contends that this opinion was "demonstrably *fixed*" because Juror R. told the court that while she knew she had to listen to the evidence, the number of offenses charged "kind of would still be in [her] head."

Both the Virginia and United States Constitutions protect a defendant's right to be tried by an impartial jury. Va. Const. art. I, § 8; U.S. Const. amend. VI; *see also* Code § 8.01-358 (providing that members of the venire must "stand indifferent in the cause"). "[A] prospective juror 'must be able to give [the accused] a fair and impartial trial. Upon this point nothing should be left to inference or doubt.'" *Bradbury v. Commonwealth*, 40 Va. App. 176, 180 (2003) (second alteration in original) (quoting *Wright v. Commonwealth*, 73 Va. (32 Gratt.) 941, 943 (1879)). "[T]he Constitution does not require specific procedures or tests for determining the impartiality of a jury." *Morva v. Commonwealth*, 278 Va. 329, 341 (2009). However, "[b]y

ancient rule, any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused." *Breeden v. Commonwealth*, 217 Va. 297, 298 (1976).[8]

"[A] trial court's denial of a motion to strike a juror for cause 'will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion.'" *Townsend v. Commonwealth*, 270 Va. 325, 329-30 (2005) (quoting *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001)). An underlying question of juror impartiality is one of fact, and the trial court's determination on the subject is "entitled to great deference on appeal" unless "plainly wrong or unsupported by the record." *Huguely v. Commonwealth*, 63 Va. App. 92, 121, 127 (2014). In addressing whether a juror should have been struck for cause, an appellate court must consider the juror's "entire voir dire, not just isolated portions." *Juniper v. Commonwealth*, 271 Va. 362, 401 (2006) (quoting *Jackson v. Commonwealth*, 267 Va. 178, 191 (2004)).

It is well settled that "[i]f [a juror] has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law." *Keepers v. Commonwealth*, 72 Va. App. 17, 42 (2020) (second alteration in original) (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 60-61 (2011)). "A manifest error in refusing to strike a juror 'occurs when the record shows that a prospective juror cannot or will not lay aside his or her preconceived opinion.'" *Harvey v. Commonwealth*, 76 Va. App. 436, 454 (2023) (quoting *Taylor v. Commonwealth*, 67 Va. App. 448, 456 (2017)). However, "[i]t is not uncommon to discover during *voir dire* that prospective jurors have preconceived notions, opinions, or misconceptions about the criminal justice system, criminal trials and procedure, or about the particular case." *Lovos-Rivas*, 58 Va. App. at 61 (alteration in

---

[8] Juror R. was ultimately removed via a peremptory strike. "It is prejudicial error for the trial court to force a defendant to use peremptory strikes to exclude a venireman from the jury panel if that person is not free from exception." *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005). "The striking of any individual potential juror for cause, however, is committed to the sound discretion of the trial court." *Id.*

original) (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 761 (2000)). "The opinion entertained by a juror, which disqualifies him, is an opinion of that *fixed character* which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Id.* (quoting *Justus v. Commonwealth*, 220 Va. 971, 976 (1980)).

In this case, we conclude that Juror R.'s voir dire, viewed in its entirety, did not demonstrate that her opinion—that the number of charges appellant faced was indicative of his guilt—was a fixed opinion. Here, during individual voir dire, Juror R. first unequivocally stated that she had already set aside her initial reaction to the number of charges faced by appellant. She later made equivocal statements regarding her initial reaction, stating that she "guess[ed]" she would have to listen to the evidence, but that the number of charges "kind of would still be in [her] head." However, upon the trial court's questioning, Juror R. made clear that she would be able to follow the court's instructions of law, including the instruction that she could only find appellant guilty based on the law and the evidence. Juror R. stated that she understood the trial process and would be able to follow the court's instruction. Overall, these answers indicate that Juror R.'s initial opinion about appellant's number of charges indicating his guilt was not fixed.

In addition, we note that "a trial judge who personally observes a juror, including the juror's tenor, tone, and general demeanor, is in a better position than an appellate court to determine whether a particular juror should be str[uck]." *Teleguz v. Commonwealth*, 273 Va. 458, 475 (2007). Here, the trial court had the ability to listen to Juror R.'s answers and determine what significance to give to her various statements, including her equivocal answer that her initial reaction "*kind of* would still be in [her] head." (Emphasis added).

Appellant argues, however, that the trial court inappropriately rehabilitated Juror R. through its questioning of her. "The trial court's role during the juror's *voir dire* also impacts the extent to which we defer to its judgment." *Keepers*, 72 Va. App. at 45. "We recognize that

'when a trial court itself becomes involved in the rehabilitation of a potential juror, we must review the court's decision to retain the person on the panel more carefully.'" *Harvey*, 76 Va. App. at 456 (quoting *Bradbury*, 40 Va. App. at 181). "However, the judge may give basic instructions and ask general clarifying questions as 'necessary to determine the presence of bias' in the first instance." *Id.* (quoting *McGill v. Commonwealth*, 10 Va. App. 237, 243 (1990)). "Such questioning does not constitute rehabilitation." *Id.* "If a trial judge adheres to this role, an appellate court may not set aside the trial judge's determination of a juror's impartiality if the juror's responses, even though conflicting, support that determination." *Id.* (quoting *McGill*, 10 Va. App. at 243).

In the instant case, after counsel for appellant's questioning of Juror R., the court gave the juror a clarifying instruction, informing her that she could only find appellant guilty based on the evidence and could not infer guilt from the fact that he had been charged with an offense. When asked by the court if she could "apply that fairly," she stated, "Yes." However, rather than merely providing assent to the court's questioning, Juror R. further stated, "That is your rule, and I have to do it the way you say do it." When the trial court told her that it did not "want to put words in [her] mouth" and wanted her "to understand that that's the process," Juror R. told the court, "I understand." "Mere assent to a trial judge's questions or statements . . . is not enough to rehabilitate a prospective juror who has initially demonstrated a prejudice or partial predisposition." *Griffin v. Commonwealth*, 19 Va. App. 619, 625 (1995). Evidence of a venireman's impartiality "should come from him and not be based on his mere assent to persuasive suggestions." *Bradbury*, 40 Va. App. at 181 (quoting *Breeden*, 217 Va. at 300). We conclude that Juror R.'s own responses, which were not merely "yes" answers to the trial court's questioning, provided evidence that her initial reaction upon hearing the number of charges against appellant was not fixed. Rather, she indicated in her own words that she understood the

legal instruction regarding the presumption of innocence after being instructed on it and could set aside her prior opinion.

Contrary to appellant's assertion, the record demonstrates that the trial court's questioning and instruction of Juror R. constituted clarification and not improper rehabilitation. Accordingly, we conclude that the court did not err in denying appellant's motion to strike the juror.

B.  Sufficiency of the Evidence

Appellant contends that the trial court erred in denying his motions to strike the evidence for his charges of unlawfully obtaining DMV documents, making a false statement on an application for a certificate of title, grand larceny, and money laundering and attempted money laundering.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v. Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

"To the extent our analysis of the sufficiency of the evidence requires us to examine the statutory language, we review issues of statutory construction *de novo* on appeal." *Hillman v. Commonwealth*, 68 Va. App. 585, 592 (2018) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 537 (2015)).

### 1. Unlawfully Obtaining DMV Documents

Code § 46.2-105.2(A) provides

> [i]t shall be unlawful for any person to obtain a Virginia driver's license, special identification card, vehicle registration, certificate of title, or other document issued by the [DMV] if such person has not satisfied all legal and procedural requirements for the issuance thereof, or is otherwise not legally entitled thereto, including obtaining any document issued by the [DMV] through the use of counterfeit, forged, or altered documents.

Appellant argues that the evidence was insufficient to support his convictions under Code § 46.2-105.2(A) because there was insufficient evidence of an unlawful act. He contends that there was no evidence in the record that he did not "satisf[y] all legal and procedural requirements" to receive title to the vehicles because he met all of the requirements set out in the AVP at the time of the offense.

Code § 46.2-1200, the definitional section governing Virginia's AVP, defines an "[a]bandoned motor vehicle," in relevant part, as one that "[i]s left unattended on public property

- 15 -

for more than 48 hours in violation of a state law or local ordinance." Code § 46.2-1200(2). As noted above, to obtain the title to an abandoned vehicle, an applicant must first complete an application for a record request through the DMV to determine who is the owner or lienholder of the vehicle. The code section discussing this process directs that "[a]ny person *in possession of* an abandoned motor vehicle shall initiate with the [DMV], in a manner prescribed by the Commissioner, a search for the owner and/or lienholder of record of the vehicle." Code § 46.2-1202(A) (emphasis added). The statutory scheme clearly sets out that to utilize the AVP, the applicant must be in possession of the abandoned vehicle.

The threshold question here, then, is whether appellant was in possession of the vehicles for which he obtained titles from the DMV. Code § 46.2-1200 does not provide a definition for the term "in possession of." Appellant argues that the word "possession" is ambiguous in this context because "no person or entity would have keys, title, or a way to control a car left on the side of the road" and that there is "no obvious way one could inherently or obviously 'possess' an abandoned car." Thus, appellant claims, the only sensible interpretation is that an individual possesses a vehicle under the statute if the person knows where the vehicle is located and also knows that the vehicle was abandoned on the side of the road for more than 48 hours, in violation of a state or local ordinance.[9]

"We apply the plain meaning of the language appearing in the statute unless it is ambiguous or applying the plain language leads to an absurd result." *Baldwin v. Commonwealth*, 69 Va. App. 75, 82 (2018) (quoting *Harvey v. Commonwealth*, 65 Va. App. 280, 285 (2015)). A statute is ambiguous if "the text can be understood in more than one way or refers to two or more

---

[9] Because we conclude that the Commonwealth's evidence was sufficient to establish that appellant was not in possession of the vehicles, we need not determine whether it established that the vehicles were abandoned on the side of the road for more than 48 hours, in violation of a state or local ordinance.

things simultaneously" or if "the language is difficult to comprehend, is of doubtful import, or lacks clearness or definiteness." *Blake v. Commonwealth*, 288 Va. 375, 381 (2014) (quoting *Boynton v. Kilgore*, 271 Va. 220, 227 n.8 (2006)).

"Where a 'statute's terms are undefined' by the legislature, we give those terms 'their "ordinary meaning," in light of "the context in which [they are] used."'" *Eley v. Commonwealth*, 70 Va. App. 158, 165 (2019) (alteration in original) (quoting *Va. Marine Res. Comm'n v. Chincoteague Inn*, 287 Va. 371, 384 (2014)). "'Possession' is defined as: 'the act or condition of having in or taking into one's control or holding at one's disposal.'" *Shifflett v. Latitude Props., Inc.*, 294 Va. 476, 483 (2017) (quoting *Webster's 3rd International Dictionary* 1770 (1993)). Applying this definition, we conclude that the plain meaning of "possession" in Code § 46.2-1202(A) is neither ambiguous nor creates absurd results when applied in the context of the statute. Rather, under this definition, it is clear that the evidence established that appellant did not have possession of the vehicles in question. The owners of the vehicles testified that they did not know appellant, did not give him possession or ownership of their cars, and instead regularly parked their vehicles themselves during the relevant time period. There is no indication that anyone but the owners had control of or held at their disposal the vehicles prior to appellant using the AVP to obtain the vehicles' titles. Because the vehicles were not in appellant's possession, he was not entitled to use the AVP to obtain their titles. Thus, it is clear that appellant obtained the titles from the DMV without "satisfy[ng] all legal and procedural requirements for the issuance thereof," or "otherwise [being] legally entitled thereto," in violation of Code § 46.2-105.2(A).[10]

---

[10] In his argument asserting that he lawfully followed the AVP, appellant emphasizes that on the 2018 online record request application, the AVP option for vehicles on public property was available to be selected by private individuals as well as local governments. He contends that this means that he, as a private individual, could possess a vehicle on public property in the same way as a local government—finding the vehicle on the street and determining that it was in

## 2. Making a False Statement on an Application for a Certificate of Title

Code § 46.2-605 provides that "[a]ny person who . . . with fraudulent intent, makes a false statement on any application for a certificate of title . . . shall be guilty of a Class 6 felony."

Appellant first argues that the evidence did not establish that his applications contained false information. He asserts that while the evidence at trial might have been sufficient to prove that he made false statements to DMV employees, it did not demonstrate that he made false statements on the actual applications for certificate of title.

Appellant supports his contention by noting that the application for certificate of title itself does not ask whether the applicant is in possession of the vehicle for which title is sought. But although this is true, the application's certification section makes an applicant certify that "all information presented in this form is true and correct, that any documents . . . presented to DMV are genuine, and that the information included in all supporting documentation is true and accurate." Here, appellant's supporting documentation included his record request receipts and vehicle removal certificates. Both documents require an applicant to state who is in possession of the vehicle. The online record request application requires the applicant to state that they are in "possession of [the] motor vehicle" and indicate a reason for their possession. Appellant listed his reason for possession of the vehicles as "possession of a motor vehicle . . . that was left unattended on public property for more than 48 hours in violation of a state law or local ordinance." The vehicle removal certificate also requires an applicant to state the name of the

___

violation of a state law or local ordinance. However, the fact that the DMV website was set up for individuals to use the AVP for vehicles on public property does not mean that the statutory scheme itself allowed for private individuals to use the AVP in that way. At the time of the offense, Code § 46.2-1201 provided that "[a]ny county, city, or town may take any abandoned motor vehicle into custody." Accordingly, by statute, a local government had the authority to take an abandoned vehicle into its possession, but nothing in the statute established that the statute conferred to private individuals a right to take possession of an abandoned vehicle on public property.

"person/authorized agent in possession of vehicle," and appellant put his name on these forms as the person in possession of the vehicles.

Appellant provided the false information that he was in possession of the vehicles on both the online record request applications and the vehicle removal certificates. Because appellant provided false information on his supporting documentation, while certifying on the applications for certificate of title that his supporting documentation was true and accurate, the evidence established that he provided false information on his applications for certificate of title.[11]

Appellant further argues that there was insufficient evidence of the fraudulent intent necessary for his convictions under Code § 46.2-605. He contends that the fact that he made no effort to hide his identity on the forms was evidence of his good faith belief that he was correctly following the AVP and therefore demonstrated his lack of intent to defraud anyone.

A person acts with fraudulent intent when he acts "with an evil intent, or with the specific intent to deceive or trick." *Burrell v. Commonwealth*, 50 Va. App. 72, 86 (2007) (quoting *Campbell v. Commonwealth*, 14 Va. App. 988, 990 (1992) (en banc)). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). "In determining a defendant's intent, '[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (alteration in original) (quoting *Coleman v.*

---

[11] On the same basis, appellant also challenges his convictions under Code § 46.2-105.2(A) for unlawfully obtaining DMV documents—that he did not provide incorrect information while using the AVP. However, as we conclude for his convictions under Code § 46.2-605, appellant provided the false information that he was in possession of the vehicles when he applied for titles to the vehicles via the AVP, and thus he obtained these titles without "satisfy[ing] all legal and procedural requirements for the issuance thereof," in violation of Code § 46.2-105.2(A).

*Commonwealth*, 226 Va. 31, 53 (1983)).  "[T]he conduct and representations of the defendant" are circumstances to consider in deciding whether fraudulent intent exists in a particular case, and "[w]hether fraud actually existed will depend upon the circumstances of each case."  *Rader v. Commonwealth*, 15 Va. App. 325, 329 (1992) (quoting *Norman v. Commonwealth*, 2 Va. App. 518, 519, 520 (1986)).  In addition, "[t]he statements and conduct of an accused after the events that constitute the charged crime may also be relevant circumstantial evidence of intent."  *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011).  "[W]hether the required intent exists is generally a question of fact for the trier of fact."  *Brown v. Commonwealth*, 68 Va. App. 746, 787 (2018) (alteration in original) (quoting *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977)).

Here, the conduct and representations of appellant plainly indicate his fraudulent intent in making false statements on his applications for certificate of title.  He claimed on several forms that he was in possession of the vehicles when the evidence demonstrated that the owners of the vehicles did not know appellant and did not give him permission to control or have at his disposal the vehicles in any manner.  He also verbally misrepresented where the vehicles were located when he provided his paperwork to the DMV.  He told two DMV employees that the vehicles were located on his property, instead of on public property, in an effort to conceal the fact that he was trying to use the AVP to gain title to vehicles not in his possession.[12]  In

---

[12] Appellant argues that the trial court erred in admitting his verbal statements to the DMV employees.  "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion."  *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020) (quoting *Amonett v. Commonwealth*, 70 Va. App. 1, 9 (2019)).  Evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence."  Va. R. Evid. 2:401.  Appellant contends that because Code § 46.2-605 criminalizes only "false statement[s] on any application for a certificate of title," his verbal statements to the DMV employees were irrelevant and therefore inadmissible.  However, the fact that appellant lied to two different DMV employees regarding the location of vehicles for which he sought title was relevant to show his fraudulent intent, because it demonstrated his intent to conceal the fact that he was not actually in possession of the vehicles and therefore was using the AVP unlawfully.

addition, appellant used the AVP five times to obtain titles to the vehicles. Evidence that the accused "perpetrated more than one fraud [at] about the same time is relevant to show his fraudulent intent." *Mughrabi v. Commonwealth*, 38 Va. App. 538, 546 (2002); *see also Bourgeois v. Commonwealth*, 217 Va. 268, 273 (1976) ("[W]here an accused has perpetrated similar frauds and by false representation obtained valuable consideration, evidence of such acts has been held to be admissible as bearing on fraudulent intent."). While appellant notes that he did not attempt to conceal his identity on the applications for certificate of title, this fact alone does not negate the other evidence in the record indicating his fraudulent intent in his use of the AVP. Accordingly, based upon appellant's written and verbal representations, and the number of offenses he committed during a short period of time, we conclude that the evidence is sufficient to prove that he had the fraudulent intent necessary for his convictions under Code § 46.2-605.[13]

---

[13] On the same ground, appellant also challenges his convictions under Code § 46.2-105.2(A) for unlawfully obtaining DMV documents—he argues that he lacked the requisite fraudulent intent necessary for a conviction under that code section. On brief, the Commonwealth argues that intent to defraud is not an element under Code § 46.2-105.2(A), noting that the jury instructions in this case only listed intent to defraud as an element for appellant's violations of Code § 46.2-605. We conclude that the best and narrowest ground for resolving this issue is to assume without deciding that even if Code § 46.2-105.2(A) contains an intent to defraud element, it was satisfied in this case by appellant's conduct showing his fraudulent intent as described above. *See Ali v. Commonwealth*, 75 Va. App. 16, 37 n.9 (2022) (noting that "[t]he doctrine of judicial restraint requires that appellate courts decide cases on the best and narrowest ground" and that "[t]he mechanism of assuming without deciding a particular point in issue sometimes facilitates the appellate court's achievement of this goal").

### 3. Grand Larceny

Appellant argues that the evidence was insufficient to support his three grand larceny convictions[14] because there was insufficient evidence of a taking against the will or without the consent of the owner.

"Larceny, a common law crime, is the wrongful or fraudulent taking of another's property without his permission and with the intent to deprive the owner of that property permanently." *Tarpley v. Commonwealth*, 261 Va. 251, 256 (2001). For statutes contained in Title 46.2, "owner" is defined as "a person who holds the legal title to a vehicle." Code § 46.2-100; *see also McDuffie v. Commonwealth*, 49 Va. App. 170, 175-76 (2006) ("[C]ertificate of title serves not only as a substitute recording system but also as evidence of ownership.").

Appellant asserts that because the vehicles were taken after he obtained titles to them, they were not taken without their owners' permission, as he was their owner after obtaining the titles. We reject appellant's argument and conclude that because his titles to the vehicles were procured through his fraudulent actions, they did not convey legal title to him. Appellant's fraudulent use of the AVP to obtain the vehicles' titles was the first part of his larcenous scheme to deprive the rightful owners of their vehicles. He committed an initial larceny in obtaining the titles themselves—he used the AVP to fraudulently take another's property, namely the titles to the vehicles that were issued to him by the DMV but which legally belonged to the vehicles' true owners. He then committed the charged larcenies of the three vehicles themselves, physically taking the vehicles from the streets and later attempting to sell two of them at auction. In Virginia, "a thief takes no title in the property he steals and can transfer none." *Castle Cars, Inc. v. U.S. Fire Ins. Co.*, 221 Va. 773, 778 (1981); *see also Toyota Motor Credit Corp. v. C.L.*

---

[14] Appellant was convicted of grand larceny for the 2009 Mini Cooper, the 2016 Mini Cooper, and the 2012 Toyota Camry, the three vehicles which were stolen in the City of Richmond.

*Hyman Auto Wholesale, Inc.*, 256 Va. 243, 247 (1998) ("Longstanding Virginia law provides that one who does not have title to goods cannot transfer title to a buyer . . . . Thus, a thief cannot pass title to stolen goods even to an innocent purchaser who pays for the stolen goods." (citation omitted)). Because he obtained the titles and vehicles through his larcenous actions, at the time he took the vehicles, appellant did not have "*legal* title" to them. Code § 46.2-100 (emphasis added). He merely had the physical certificates of title. Accordingly, he was not the owner of the vehicles at the time he stole them and the evidence was sufficient to support his larceny convictions.

### 4. Money Laundering Offenses

Code § 18.2-246.3(A) makes it "unlawful for any person knowingly to conduct a financial transaction where the person knows the property involved in the transaction represents the proceeds of an activity which is punishable as a felony." In turn, Code § 18.2-246.2 defines a "financial transaction" as

> any purchase, sale, trade, loan, pledge, investment, gift, transfer, transmission, transportation, delivery, deposit, withdrawal, payment, transfer between accounts, exchange of currency, extension of credit, purchase or sale of monetary instruments, use of a safe-deposit box, or any other acquisition or disposition of monetary instruments by any means including the movement of funds by wire or other electronic means, which is knowingly designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the property involved in the transaction.

Appellant argues that a financial transaction under Code § 18.2-246.2 must involve the "acquisition or disposition of monetary instruments" and that here the Commonwealth did not present sufficient evidence of a financial transaction, as it failed to present any evidence about an exchange of money.

Assuming without deciding that a financial transaction under the statute must involve the acquisition or disposition of monetary instruments, we reject appellant's contention that in this

- 23 -

case, the Commonwealth's evidence failed to establish that such a financial transaction occurred. Tolliver testified that he "enter[ed] an agreement to auction vehicles on behalf" of appellant and "ha[d] an agreement to pay [appellant] the money." The 2009 Mini Cooper was sold at auction and Tolliver received about $4,800 for the vehicle. He did not actually give any of the proceeds to appellant because the second car for auction, the 2016 Mini Cooper, was identified as stolen.

While appellant did not receive money from Tolliver, this is not dispositive as to whether a financial transaction occurred. Code § 18.2-246.3(A) makes it "unlawful for any person knowingly *to conduct* a financial transaction where the person knows the property involved in the transaction represents the proceeds of an activity which is punishable as a felony." (Emphasis added). Code § 18.2-246.2 defines "conduct" as including "initiating, concluding, participating in, or assisting in a financial transaction." Appellant initiated a financial transaction with Tolliver. He made an agreement with Tolliver to sell the vehicles, and Tolliver received money in exchange for auctioning the 2009 Mini Cooper. While appellant did not receive any money as a result of his agreement, he did initiate the transaction, thus we could conclude that the evidence was sufficient to prove that he conducted a financial transaction in this case.

Appellant also argues that there was insufficient evidence of an attempt to conceal or disguise the ownership of the property involved. Code § 18.2-246.2 requires that the financial transaction be one "which is knowingly designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the property involved in the transaction." Appellant asserts that the evidence demonstrated that he did not hide what he was doing, as he titled all of the vehicles in his own name, went to the DMV in person, and directly transferred the vehicles from his name to Tolliver.

In resolving this issue, we find instructive the federal cases interpreting the federal money laundering statute. Similar to Code § 18.2-246.2, a violation of 18 U.S.C. § 1956, the federal

money laundering statute, occurs when a defendant conducts a financial transaction "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). In a prosecution under this statute, the government must prove "a specific intent to structure a transaction so as to conceal the true nature of the proceeds." *United States v. Gilliam*, 975 F.2d 1050, 1056 (4th Cir. 1992). "A conviction requires evidence of intent to disguise or conceal the transaction, whether from direct evidence, like the defendant's own statements, or from circumstantial evidence, like the use of a third party to disguise the true owner, or unusual secrecy." *United States v. Cruzado-Laureano*, 404 F.3d 470, 483 (1st Cir. 2005). "The 'most obvious type' of evidence that would support a finding of intent to disguise the proceeds of unlawful activity is 'that of employing a third party in order to conceal the defendant's identity from others.'" *United States v. Marshall*, 248 F.3d 525, 539 (6th Cir. 2001) (quoting *United States v. Lovett*, 964 F.2d 1029, 1034 n.3 (10th Cir. 1992)).

We find the principles articulated above applicable to this case and conclude that the evidence was sufficient to establish appellant's intent to conceal or disguise the source of the property involved. Here, appellant entered into an agreement with Tolliver to auction the two vehicles and signed over the titles of both vehicles to him. By employing a third party to sell the vehicles at auction, appellant demonstrated his intent to structure the transaction so as to conceal the true source of the property involved in the transaction. While it was relatively easy to trace the vehicles back to appellant, "the money laundering statute does not require the jury to find that [accused] did a good job of laundering the proceeds." *United States v. Sutera*, 933 F.2d 641, 648 (8th Cir. 1991). In the instant case, appellant's use of Tolliver, a third party, constituted sufficient evidence to show that the transaction was designed in whole or in part to conceal or disguise the source of the property involved in the transaction.

Further, the evidence regarding appellant's acts in relation to the 2016 Mini Cooper was sufficient to support his attempted money laundering conviction. "Whether the actions of a particular defendant rise to the level of an attempted crime is a fact-specific inquiry that must be decided on a case-by-case basis." *Ashford v. Commonwealth*, 47 Va. App. 676, 681 (2006). "An attempt to commit a crime is composed of two elements: (1) The intent to commit it; and (2) a direct, ineffectual act done towards its commission." *Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)). "The direct but ineffectual act is commonly referred to as an 'overt act.'" *Jones v. Commonwealth*, 70 Va. App. 307, 318 (2019) (en banc) (quoting *Jay v. Commonwealth*, 275 Va. 510, 525 (2008)). Appellant's intent to commit the offense was evidenced by his agreement to sell the vehicles, the proceeds of his grand larcenies, at auction via Tolliver. His signing over the title and giving the vehicle to Tolliver was the direct act done toward the commission of the offense that was only ineffectual because the 2016 Mini Cooper was identified as stolen.

Accordingly, because the evidence established that appellant conducted a financial transaction designed to conceal the source of the 2009 Mini Cooper and that he attempted to do so for the 2016 Mini Cooper, we conclude that the trial court did not err in finding the evidence sufficient to support both convictions.[15]

---

[15] Appellant also argues that his actions did not constitute money laundering or attempted money laundering because he did not know that the property involved in the transaction represented the proceeds of a felonious activity. Code § 18.2-246.3 provides that it is "unlawful for any person *knowingly* to conduct a financial transaction where the person knows the property involved in the transaction represents the proceeds of an activity which is punishable as a felony." (Emphasis added). Appellant argues that the record demonstrates that he believed his use of the AVP was entirely legal. We reject appellant's argument, which is belied by appellant's fraudulent statements on the AVP documents concerning possession of the vehicles and his misrepresentations to the DMV employees about the locations of the vehicles.

C.  Jury Instructions

Appellant argues that he was entitled to instructions on a good faith claim-of-right defense and a good faith reliance defense.

"As a general rule, the decision to grant or deny proffered instructions rests within the sound discretion of the trial court." *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014).  Our "responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Conley v. Commonwealth*, 74 Va. App. 658, 674-75 (2022) (quoting *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019)).  "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

"[W]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Dandridge v. Commonwealth*, 72 Va. App. 669, 676 (2021) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 260 (2018)).  A trial court "*may not refuse to grant a proper, proffered instruction*" if there is more than "a scintilla" of evidence supporting the instruction.  *Id.* at 680 (quoting *King v. Commonwealth*, 64 Va. App. 580, 587 (2015) (en banc)).  "Whether there is more than a mere scintilla of evidence is determined on a case-by-case basis." *Jones v. Commonwealth*, 71 Va. App. 70, 94 (2019).  "If the instruction is not applicable to the facts and circumstances of the case, it should not be given." *Commonwealth v. Sands*, 262 Va. 724, 729 (2001).  "Thus, it is not error to refuse an instruction when there is no evidence to support it." *Id.*

"A jury must be instructed on any theory or affirmative defense supported by the evidence." *McCoy v. Commonwealth*, 9 Va. App. 227, 229 (1989).  This Court must decide

whether the evidence when viewed in the light most favorable to the defendant's theory required the requested instruction. *Id.*

### 1. Claim-of-Right Defense

Appellant asked the trial court to instruct the jury on a good faith claim-of-right defense in relation to the three grand larceny offenses. His proposed instruction stated, "If you find that [appellant], in good faith, believed that the [vehicle] belonged to him at the time of the taking then you shall find [appellant] not guilty of grand larceny." After noting that none of the witnesses had testified that they had allowed appellant to take their vehicles, the trial court asked counsel for appellant for the basis for the instruction. Counsel for appellant stated that "there is at least a scintilla of evidence here" because appellant "received title."

"[T]here can be no larceny of the property taken if it, in fact, is the property of the taker, or if he, in good faith, believes it is his, for there is lacking the criminal intent which is an essential element of larceny." *Pena Pinedo v. Commonwealth*, 300 Va. 116, 122 (2021) (alteration in original) (quoting *Butts v. Commonwealth*, 145 Va. 800, 811-12 (1926)). "When successful, a claim-of-right defense negates the defendant's *animus furandi*—the 'intent to steal' *mens rea* element of larceny." *Groves v. Commonwealth*, 50 Va. App. 57, 63 (2007) (quoting Rollin M. Perkins, *Criminal Law* 265-66, 271 (2d ed. 1969)). "The claim-of-right defense requires a predicate showing of 'good faith,' a *bona fide* belief by the taking party that []he has some legal right to the property taken." *Id.* (quoting *Butts*, 145 Va. at 812). "A claim-of-right defense may be based on a good faith, yet mistaken, claim to property." *Pena Pinedo*, 300 Va. at 122. "Any claim of right underlying the defense, however, must be sincere and not merely a dishonest pretense." *Id.* "Where the evidence is conflicting the question of *bona fides* is for the trier of the facts." *Groves*, 50 Va. App. at 63 (quoting *Pierce v. Commonwealth*, 205 Va. 528, 534 (1964)). However, while "[u]sually the question of bona fides is one for the jury, . . .

where . . . the facts are undisputed, and only one conclusion could be fairly drawn therefrom by reasonable men, it is a question of law for the court." *Pena Pinedo*, 300 Va. at 122 (quoting *Butts*, 145 Va. at 814).

Appellant asserts that there was evidence in this case showing the basis for appellant's good faith belief that he was entitled to the vehicles—he found the AVP, a legitimate process through the DMV, utilized that process, and subsequently received titles to the vehicles from the DMV. Therefore, he contends that the trial court should have left the question of whether this belief was reasonable to the jury and given the instruction.

We disagree and conclude appellant's actions did not demonstrate a "good faith, yet mistaken, claim to property." *Pena Pinedo*, 300 Va. at 122. Appellant did not have a good faith belief that he owned the vehicles at issue because his obtaining of their titles was predicated on his fraudulent statements on the AVP documents that he was in possession of the vehicles. He could not have sincerely believed that he was in possession of the vehicles at the time he completed the applications for certificates of title because the vehicles were located on public streets and were regularly parked there by their true owners. All of the owners testified that they did not give appellant permission to use or take their vehicles. Further, appellant's misrepresentations to the DMV employees that the vehicles were located on his private property contradicts his argument that he acted on a sincere belief, rather than a dishonest pretense. Thus, while a jury instruction should be given if there is more than "a scintilla" of evidence supporting the instruction, "it is not error to refuse an instruction when there is no evidence to support it." *Sands*, 262 Va. at 729. The trial court did not err in refusing to instruct the jury on a good faith

claim-of-right defense when there was no reasonable basis for appellant to believe that the vehicles, located on public streets, were possessed by him.[16]

## 2. Good Faith Reasonable Reliance Defense

Appellant also asked the trial court to instruct the jury on a good faith reliance defense, pursuant to *Miller v. Commonwealth*, 25 Va. App. 727 (1997), for the unlawfully obtaining documents from the DMV charges. Counsel for appellant told the court that the basis for giving such an instruction was that "the evidence we have in this case [was] that [appellant] was informed it was lawful . . . off of the Virginia Code and the DMV website and the guidance on the website." When asked by the court what evidence was presented as to whether appellant was given assurance that what he was doing was legal, counsel for appellant said, "certainly we didn't present affirmative evidence in the way of [appellant]'s testimony or testimony from a witness that they made a specific verbal assurance," but that there was "a scintilla of evidence in the fact that he was given the titles physically, that that is essentially the assurance I am arguing." The court refused the instruction, noting that it thought "it is misleading of the law in the case" and that "more importantly, there is no affirmative evidence provided in accordance with *Miller*."

The due process defense articulated in *Miller* is one where "the criminal statute under which the defendant is being prosecuted cannot constitutionally be applied to the defendant without violating due process of law, where government officials have misled the defendant into believing that his conduct was not prohibited." *Miller*, 25 Va. App. at 736 (quoting Jeffrey F.

---

[16] Appellant also asserts that the evidence was insufficient to support his grand larceny convictions because he had a good faith claim-of-right to the vehicles and therefore lacked the necessary intent to support these convictions. Appellant maintains that once he obtained the titles to the vehicles, he had a reasonable, good faith belief that he legally owned them. As we determine above, appellant only obtained the titles through his fraudulent use of the AVP and therefore could not have had a good faith belief in his ownership of the vehicles, despite the fact that the DMV had issued the titles to him.

Ghent, Annotation, *Criminal Law: "Official Statement" Mistake of Law Defense*, 89 A.L.R.4th 1026, 1031 (1991)). "To avail oneself of this due process 'defense,' a defendant must prove three things." *Park v. Commonwealth*, 74 Va. App. 635, 652 (2022). First, he must establish "that he was assured that the conduct giving rise to the conviction was lawful." *Branch v. Commonwealth*, 42 Va. App. 665, 671 (2004). Second, the defendant must demonstrate "that the assurance was given by a 'government official,' i.e., 'a public officer or body charged by law with responsibility for defining permissible conduct with respect to the offense at issue.'" *Id.* (quoting *Miller*, 25 Va. App. at 739). Third, he must prove "that, based on the totality of the circumstances, reliance upon the advice was reasonable and in good faith." *Id.* "[I]t is the *defendant's* burden to establish this 'affirmative defense.'" *Id.* (quoting *Miller*, 25 Va. App. at 737).

Based on this record, we need only examine the first prong of this test. We conclude that the evidence clearly showed that appellant failed to receive assurances from DMV employees that his use of the AVP was lawful. "With respect to content, the defense is available only where the information upon which the defendant has relied is an affirmative assurance that the conduct giving rise to the conviction is lawful." *Miller*, 25 Va. App. at 738. "In the absence of such an affirmative assurance," therefore, "the due process concerns that the defense is designed to protect are not implicated, and the defense fails." *Id.*

Appellant argues that a *Miller* instruction should have been provided to the jury for the unlawfully obtaining documents from the DMV offenses. Here, the conduct giving rise to those convictions was appellant's statements on the AVP documents that he was in possession of the five vehicles at issue. Appellant asserts that he received affirmative assurances from the DMV that he appropriately used the AVP through the acceptance of his paperwork and issuance of title to each of the cars. But the mere acceptance of paperwork and the issuance of the titles does not

qualify as an affirmative assurance that the conduct giving rise to his convictions was lawful. *Cf.*

*Claytor v. Commonwealth*, 62 Va. App. 644, 655-56 (2013) (holding that the *Miller* defense did

not apply where the defendant subjectively interpreted a court order to have reinstated his driving

privileges because the defendant "sought no determination of conduct," and therefore "the court

had no occasion to give an 'affirmative assurance' that such conduct was permissible").

Appellant did not receive an affirmative assurance on the lawfulness of his use of the AVP from

any DMV employee. This was in fact conceded by counsel for appellant at trial when she stated,

"certainly we didn't present affirmative evidence in the way of [appellant]'s testimony or

testimony from a witness that they made a specific verbal assurance." Because there was not

more than a scintilla of evidence supporting appellant's claim that he was assured that the

conduct giving rise to the convictions was lawful, we conclude that the trial court did not err in

refusing to give a *Miller* instruction.

III.  CONCLUSION

We hold that the trial court did not err in failing to strike a juror for cause, in denying appellant's motions to strike the evidence, or in denying jury instructions on good faith claim-of-right and good faith reasonable reliance.  Accordingly, we affirm.[17]

*Affirmed.*

---

[17] Appellant finally argues that the trial court erred in not setting aside the jury's verdict because Virginia's AVP statutes are void for vagueness.  We do not address this argument on appeal because appellant failed to obtain a ruling from the trial court on this issue.  "It is the appellant's burden 'to obtain a clear ruling from the [circuit] court' on an issue he wishes to raise on appeal.  This burden stems from the requirement that a litigant state an objection 'with reasonable certainty at the time of the ruling.'"  *McDaniel v. Commonwealth*, 73 Va. App. 299, 313 (2021) (first quoting *Young v. Commonwealth*, 70 Va. App. 646, 657 (2019); and then quoting Rule 5A:18).  On September 20, 2021, appellant filed a *pro se* handwritten motion to set aside his convictions where he argued in part that the AVP statutes are void for vagueness.  The sentencing order, entered October 1, 2021, does not address appellant's *pro se* motion.  On December 20, 2021, appellant filed a *pro se* motion asking the trial court to hear his *pro se* motion to set aside.  While appellant did file a motion asking the trial court to hear his motion to set aside, it was filed more than 21 days following the entry of the sentencing order in this case, and therefore the trial court had already lost jurisdiction over the convictions.  *See* Rule 1:1.  Because there was no ruling on appellant's void-for-vagueness argument in the trial court, this issue was not preserved for appellate review.  *See Westlake Legal Grp. v. Flynn*, 293 Va. 344, 352 (2017) (holding that assignments of error were not preserved for appeal where the arguments they contained were first made in a motion to reconsider and the record contained no indication that a hearing was requested or that the motion was heard or decided).